1 ?PETTIGREW, J.
This matter arises out of the effect and interpretation to be afforded a management agreement between the plaintiff, a real estate firm, and defendant, the subsequent transferee of a commercial building. Defendant now appeals from a trial court judgment in favor of plaintiff.
FACTS
Robert L. “Bob” Durham (“Mr.Durham”) is the sole shareholder of Durham Real Estate, Inc., substitute plaintiff herein. Mr. Durham, through his employment with C.J. Brown Realty, created and headed that firm’s commercial property management and sales division for nearly twenty-five years prior to his departure in 1986. Through the influence of his then-employer, Heidel Brown[1], Mr. Durham developed a long-standing business relationship with City National Bank (“City National”). Mr. Durham testified that his personal friendships with several bank officers and board members allowed him to represent City National in its various real estate transactions, including commercial leasing and property management as well as real estate sales. As their business relationship was built upon a long-standing friendship and “absolute trust”, Mr. Durham stated that he never felt the need to reduce his relationship with City National to-writing.
Initially, Mr. Durham’s work on behalf of City National consisted almost exclusively of real estate appraisals with some real estate sales. Following the completion in the early 1980s of City National’s new headquarters known as the City Plaza building situated at 445 North Boulevard in Baton Rouge, Mr. Durham became more involved in property management and commercial leasing. Mr. Durham testified that his customary fee for these services was 6 percent. • In 1984, shortly after City National relocated to space within the City Plaza building, Mr. Durham, through his employment with C.J. Brown Realty, sold the bank’s former offices that were also located on North Boulevard for $1,100,000.00. Despite the absence of a written agreement regarding a fee, Mr. Durham ^testified that he received 80 percent of the 6 percent fee paid to his employer, C.J. Brown Realty. When Heidel Brown decided to sell his company, Mr. Durham purchased the property management accounts of C.J. Brown Realty and formed his own corporation, Durham Management, Inc. (“Durham Management”).
City National was acquired in 1987 by First Commerce Corporation (“First Commerce”), and Robert Sossaman, property manager for First Commerce, purportedly wanted to formalize his relationship with Mr. Durham and place it into writing. Accordingly, Mr. Durham’s firm, Durham Management, provided a management agreement, produced by the Institute of Real Estate Management of the National Association of Realtors, that Durham Management, and City National[2] executed on *492 June 3, 1987, and covered the exclusive rental, lease, operation, and management of the City Plaza building situated at 445 North Boulevard in Baton Rouge, Louisiana, for the succeeding twelve months.
Pursuant to terms typed into the agreement, Durham Management was to receive $1,500.00 per month as a management fee in addition to a 6 percent commission on gross rents collected from the lease of office space within the building. The ' agreement did not authorize Mr. Durham to list anything for sale or to sell anything. Language typed into the agreement at Paragraph 4(d)(5) reserved to the owner [defined therein as City National] the right to sell its building. Further language provided that “Agent [defined therein as Durham Management] will be protected on any sale involving another broker.”[3] Later, a one-year renewal contract, identical to the original management agreement, was signed on July 13, 1988, by Mr. Durham and the new bank president of City National, E. Graham Thompson. Subsequently, Mr. Durham and Mr. Thompson executed a second renewal of their one-year management contract on April 16, 1990. This agreement was identical to the previous two agreements. All three agreements provided for automatic Lrenewals for annual periods at the conclusion of the one-year term specified.- The agreements could be cancelled by either party upon thirty days written notice after the expiration of the specified term.
The agreements further provided that the contract would be binding upon the successors ‘ and assigns of Durham Management and the heirs, administrators, executors, successors, and assigns of City National. The current plaintiff, Durham Real Estate, Inc.,[4] is the successor and assignee of Durham Management by virtue of a previous assignment. Defendant, Bank One, is City National’s successor and assignee as it relates to the agreement.
Mr. Durham testified that during the first quarter of 1998, rumors were rampant that Bank One was interested in purchasing First Commerce/City National and purportedly there were constant discussions by bank officials about the probability that the City Plaza building would be sold. Mr. Durham further testified that although the building was not for sale at that time, bank officers encouraged him to locate a prospective buyer. Relying on the authority of his 1990 management agreement, Mr. Durham stated that he seized the initiative and undertook extensive efforts to sell the City Plaza building for the bank. Mr. Durham claimed that as part of this effort, he telephoned specific individuals in the Baton Rouge area whom he thought might be interested in purchasing the building, and if said individuals requested additional information, he provided them with confidential information regarding operating expenses and rent rolls. During the first half of 1998, Mr. Durham claimed to have contacted, provided information to, and showed the building to Mike Wampold, who ultimately purchased the building.
On June 12, 1998, First Commerce/City National officially merged with Bank One. Bank One later sold the City Plaza build *493 ing in the early months of 1999 to a company Downed by Mr. Wampold for $16 million dollars. Trammel Crowe[5] and Latter & Blum Realty assisted in this sale and split a negotiated real estate commission of 1 percent. Bank One did not pay a real estate commission to Durham Management, and Durham Management instituted this suit on May 31, 2000.
ACTION OF THE TRIAL COURT
On February 14, 2001, Bank One filed a peremptory exception raising the objection of no right of action, or in the alternative, a motion for summary judgment. The basis of Bank One’s objection was that Durham Management was prohibited from contracting for a real estate commission due to its failure to hold a valid real estate license at either the time the agreement was contracted or the time of the subsequent sale. Durham Management sought leave of court on April 20, 2001, to substitute Durham Real Estate as the proper party plaintiff in this matter. For reasons orally assigned, the trial court denied Bank One’s exception as to no right of action and alternative motion for summary judgment. Bank One’s subsequent applications for supervisory writs were similarly denied.[6]
A trial on the merits took place on September 9 and 10, 2002. Post-trial briefs were subsequently filed and the trial court heard oral argument from counsel on November 25, 2002. The trial court issued its written reasons for judgment on May 14, 2003, and determined that Bank One had a management agreement with Durham Management that remained in full force and effect until Durham Management acknowledged receipt of a termination letter dated October 4,1998. The trial court also found that Mr. Durham met with the eventual purchaser of the City Plaza building, Mr. Wampold, and provided him with confidential information regarding the building’s operating expenses and rent rolls. The court further found as a matter of fact that said meeting constituted the first negotiations in the eventual sale of the building that was 1 ^effectuated by.another broker. Based upon its interpretation of the terms of the management agreement, and an alleged history of similar business transactions between the parties, the trial court concluded that the facts, law, and evidence supported a finding that Mr. Durham was entitled to a commission on the sale of the City Plaza building. Specifically, the trial court concluded that pursuant to the terms of the agreement, Mr. Durham, in a sale involving another broker, was entitled to a 3 percent commission or $480,000.00[7] together with legal interest from the date of judicial demand and all costs. A judgment to this effect was rendered on June 16, 2003.
From these judgments, Bank One, on July 24, 2003, took a devolutive appeal from the judgment of May 30, 2001, which overruled its peremptory exception as to no right of action and denied its alterna *494 tive motion for summary judgment, as well as a suspensive appeal from the judgment rendered June 16, 2003.
ISSUES PRESENTED FOR REVIEW
1. Were real estate corporations exempt from licensing requirements before the amendments to Title 37 in 1997?
2. Was the “agent will be protected” language in the contract an unenforceable “agreement to agree”?
3. When was the management agreement terminated? • ,
4. When did negotiations commence for the sale of the building?
5. If plaintiff is entitled to a commission, is it entitled to a commission three times the collective amount paid to the brokers actually involved in the transaction?
STANDARD OF REVIEW
The Louisiana Constitution of 1974 provides that the appellate jurisdiction of the courts of appeal extends to both law and facts. La. Const., art. V, § 10(B). A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual | finding that is manifestly erroneous or clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La.1993). The two-part test for appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Stobart, 617 So.2d at 882. This test dictates that a reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court’s finding. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Id.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, .where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Id.
ANALYSIS
The primary issue in this case involves the interpretation of the series of management agreements between Durham Management and City National Bank.
A “Listing agreement” is defined in the Louisiana Real Estate License Law (La. R.S. 37:1430 et seq.) as a “written document signed by all owners of real estate or their authorized.attorney in fact authorizing a broker to offer or advertise real estate described in such document for sale or lease on specified terms for a defined period of time.” La. R.S. 37:1431(30). The same statute further defines “Property management” as “the marketing, leasing, or overall management of real property for others for a fee, commission, compensation, or other valuable consideration.” La. R.S. 37:1431(31).
^Additionally, Louisiana Civil Code article 2046 sets forth a general rule *495 of contract construction and provides that “[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” The meaning and intent of the parties to a written instrument is ordinarily determined from the four corners of the instrument. Gaubert v. Toyota Motor Sales U.S.A., Inc., 99-2569, p. 3 (La.App. 1 Cir. 11/3/00), 770 So.2d 879, 881. However, when the terms of a written contract are susceptible of more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or show the intention of the parties. Commercial Properties Development Corporation v. State Teachers Retirement System, 2000-0392, p. 7 (La.App. 1 Cir. 3/28/01), 808 So.2d 534, 540. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La. Civ. Code art. 2053. Whether or not a contract is ambiguous is a question of law. Hampton v. Hampton, Inc., 97-1779, p. 7 (La.App. 1 Cir. 6/29/98), 713 So.2d 1185, 1189. A contract executed in standard form of one party must be interpreted, in case of doubt, in favor of the other party. La. Civ.Code art. 2056.
The provisions of the successive management agreements at issue in this case set forth the respective duties and obligations of Durham Management and City National with regard to the rental, lease, operation, and management of the City Plaza building. None of the provisions of the management agreement provided any authority to Mr. Durham or Durham Management to list property for sale or to sell property for- City National. The dispute arises from a single provision that was typed into each agreement by Mr. Durham under Paragraph 4 relating to the specific remuneration that City National, in its capacity as the owner of the premises, agreed to pay its agent, Durham Management, for performing various duties. Following “For Management” and “For Leasing”, specific amounts of compensation were typed into the agreements; however, in the spaces following “For Modernization”, “For Refinancing” and “For Fire Restoration”, “N/A” was | atyped in, presumably to indicate that said obligations were not applicable. In the space following “For Sale”, the following language is typed in, “Bank reserves the right to sell. (Agent will be protected on any sale involving another broker.)” Durham Management contends, and the trial court subsequently held, that said provision constituted an enforceable listing agreement to sell the City Plaza building. Conversely, Bank One avers that the failure to set forth a fixed sales commission rendered said provision nothing more than an unenforceable agreement to negotiate a commission if and when the City Plaza building was ever offered for sale.
At the trial, the trial court found these provisions to be ambiguous and permitted the introduction of parol evidence to establish the intent of the parties to the agreement. Mr. Durham presented testimony from Graham Thompson, the former CEO of City National. When presented with a copy of a renewal of the management agreement between Durham Management and City National, Mr. Thompson testified that in his capacity as CEO of City National, he signed “a duplication” of the original contract executed by Bob Sossaman in 1987. When questioned as to what the language at issue meant to him, Mr. Thompson further testified that based upon what he was told by Mr. Sossaman at *496 the time, it was his understanding that Mr. Durham would be the listing agent for City National if the bank’s building was sold. On cross-examination, Mr. Thompson conceded that the agreement did not provide for a specific commission to be paid to Mr. Durham in the event the building was sold. Mr. Thompson agreed that it was his understanding that Mr. Durham and Mr. Sossaman would negotiate the specific terms of a listing agreement if the bank decided to sell the building.
Mr. Durham also called John Doiron, who was accepted by the court as an expert in the field of real estate leasing, consulting, and brokerage. In reviewing the management agreement at issue in this case, Mr. Doiron opined that while the language typed into the agreement was probably not the best, it appears to have resulted from a long-standing relationship between the parties. Mr. Doiron nevertheless opined that the management agreement constituted a listing agreement, despite the absence of an agreement regarding the authority to sell, the price for the property, the amount of the |insales commission, and the term of the listing. On cross-examination, Mr. Doiron agreed that as a real estate broker, he would attempt to specify the amount of his sales commission as part of the contract. In the instant case, Mr. Doiron admitted that the specific commission owed to Mr. Durham would have to be settled through further negotiation or litigation.
Mr. Durham conceded on cross-examination that he did not have a listing to sell the building. Mr. Durham claimed that under the terms of the management agreement he had authority to market the building for sale, but admitted that in May and June of 1999, no one had authority to sell the building.
As part of its case, Bank One called Bruce Duncan MacMorran, a real estate broker with 30-years of experience and the owner of a Baton Rouge real estate company, who was accepted by the court as an expert witness. Mr. MacMorran opined that as part of a valid listing agreement for the sale of property, there must be an authorization to sell the property, and the agreement must also set forth a specific broker’s commission. Mr. Mac-Morran did not interpret the language at issue as granting Mr. Durham a listing on the building, but merely an agreement to negotiate a commission at a later date.
In our attempt to reconcile the seemingly incongruent provision regarding a “sale” with the other provisions contained in the management agreement, we conclude, following a thorough review of the record and the testimony adduced at trial, that the terms of the management agreement set forth a contract between Durham Management and City National for Durham to manage and lease the City Plaza building for the fees specified therein. The management agreement constituted a “listing agreement” as that term is defined under La. R.S. 37:1431(30) of the Louisiana Real Estate License Law, in that it authorized Durham Management to list commercial space available for lease in the City Plaza building. Viewing the agreement as a whole, in particular Paragraphs 1, 2, and 3, we note that the language is silent with respect to Mr. Durham’s authority to “sell” anything. We further note that paragraph 4(c), which must be read in connection with Paragraphs 1, 2, and 3, and which immediately precedes the section at issue, provides in pertinent part:
ln4. c) Upon and after the termination of this agreement pursuant to the method described in Paragraph 1 hereof, Owner shall recognize Agent as the broker in any pending negotiations of said premises, or any part thereof, and in the event of the consummation thereof Own *497 er shall pay to Agent a commission therefore at the rate prescribed on Paragraph 4 d) hereof.
The only pending negotiations could be leases or rentals pursuant to Paragraphs 1, 2, and 3.
The subsequent paragraph, Paragraph 4(d), specifies the commissions owed to Durham Management for performing various functions in its capacity as agent for the owner, City National, to lease, rent, and manage the building.
As we are called upon to interpret and give specific meaning to the language in dispute, it is the opinion of this court that the primary intent of paragraph 4(d) was to set forth the amounts that the parties agreed Durham Management would be paid as compensation for its performance of various duties on behalf of City National in Paragraphs 1, 2, and 3. Paragraph 4(d) was further intended to protect Durham Management’s rights to receive any pending commissions it may be owed for its rental or lease of the premises in the event of a sale of the building.
Having concluded that the contract in question relates to the lease and management by Durham Management of the City Plaza building owned by City National, the trial court erred in its interpretation that Durham was a listing agent for the sale of the property and as such, was entitled to recover one-half, or 3 percent of a 6 percent commission. This 6 percent figure was elicited solely from the self-serving testimony of Mr. Durham, and reflects the real estate commission earned by Mr. Durham’s employer, C.J. Brown, in a single sale on behalf of City National that occurred prior to the effective date of the agreement at issue. Additionally, Mr. Durham’s boss at the time was a board member of City National, and thus said transaction cannot be analogized to the matter presently before us. No direct evidence of other sales by Mr. Durham was presented. In the opinion of this court, Section 4(d)(5) of the management agreement at issue does not constitute a listing agreement to sell property, and consequently, Durham Real Estate is not entitled to a commission on the sale of the building.
haBased upon the foregoing holding, we will pretermit further discussion of all remaining issues.
CONCLUSION
For the reasons set forth above, it is the conclusion of this court that Section 4(d)(5) of the management agreement between City National Bank/Bank One and Durham Management/Durham Real Estate did not constitute a listing agreement to sell property. Consequently, Durham Real Estate is not entitled to a commission on the sale of the building. The trial court’s award to Durham Real Estate of a 3 percent sales commission or $480,000.00 together with legal interest from the date of judicial demand and all costs is hereby reversed and set aside. Additionally, all claims put forth herein by Durham Real Estate against Bank One are hereby dismissed with prejudice, and all costs associated with this appeal shall be assessed against Durham Real Estate.
REVERSED.
CARTER, C.J., concurs.

. In connection with his trial testimony, Mr. Durham stated that his boss at the time, Hei-del Brown, served on the board of directors for City National.

. Mr. Durham testified at trial that despite its takeover by First Commerce, the bank continued to do business as City National.

. Management Agreement, Section 4(d)(5).

. Mr. Durham testified that he formed a second corporation, Durham Real Estate, Inc., for the purpose of informing the public that his was a full-service real estate firm. Mr. Durham further testified that after operating both firms simultaneously for a number of years, the Louisiana Real Estate Commission, in 1998, began licensing firms rather than individuals. Rather than buy a license for each firm, he ceased the operations of Durham Management and operated exclusively as Durham Real Estate.

. Trammel Crowe Corporate Services provided management services to Bank One properties nationwide.

. Durham Management, Inc. v. Bank One, Louisiana, National Association, 2001-CW-1436 (La.App. 1 Cir. 9/26/01) and Durham Management, Inc. v. Bank One, Louisiana, National Association, 2001-CC-2861 (La. 1/11/02), 807 So.2d238.

.The trial court stated that this finding is supported by the terms of the Management Agreement and a history of similar business transactions between the parties. Specifically, the trial court relied on Mr. Durham's testimony that he received a 6% commission in connection with the sale of City National's former headquarters, and customarily received a 3% commission when the sale involved another broker.